**SASSAFRAS ENTERPRISES,
INC., Plaintiff,**

v.

**ROSHCO, INC., Defendant.**

No. 95 C 255.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 2, 1996.

**2**

Alan M. Goldberg and Albert Cueller, III of Barnow & Hefty, P.C., Chicago, IL, for Plaintiff.

James D. Zalewa of Leydig, Voit & Mayer, Ltd., Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Sassafras Enterprises, Inc. ("Sassafras") has sued Roshco, Inc. ("Roshco") for trade dress infringement and unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125(a) (Count I), contending that Roshco's pizza stone set infringes on the trade dress of Sassafras' set containing the same components. Sassafras also asserts that the same conduct on which it pegs its Lanham Act claim also violates four Illinois statutes:

1. the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 to 505/12 (Count II);

2. the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 to 510/7 (Count III);

3. the Deceptive Advertising Act, 720 ILCS 295/1a (Count IV);  and

4. Trademark Registration Act § 15, 765 ILCS 1035/15 (Count V).[1]

Roshco has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 as to Counts I through IV,[2] and its motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Roshco's motion is granted and this action is dismissed.

### Summary Judgment Standards

Familiar Rule 56 standards impose on Roshco the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to Sassafras (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While the often-encountered need for fact-laden determinations in trade dress infringement cases may block the entry of summary judgment where such material facts are in dispute, that does not of course negate the potential for summary judgment in cases where a movant has plainly satisfied the Rule 56 standards. For that purpose summary judgment is appropriate if the record reveals that no reasonable jury could conclude that the appearance of Sassafras'

pizza stone set is either inherently distinctive or has acquired secondary meaning.

### Facts [3]

What follows in this section will suffice to establish the framework for the discussion of Roshco's motion. Other relevant facts, which fit somewhat better into the substantive legal discussion, will be set out later in the opinion.

Since the late 1970s or early 1980s Sassafras has been marketing and selling a home pizza making set comprising a pizza stone, a wooden-handled metal pizza cutter, a metal rack for the pizza stone and a recipe, use and care booklet (D. 12(m) ¶ 17). In 1994 Roshco started to sell a set with the same components (D.App. 137–42)—a set that Sassafras claims infringes on the trade dress of its own set.[4] More specifically, Sassafras claims a protectible interest in the "total image" of its set (Sassafras Mem. 6):

> a brownish-colored stoneware with a smooth texture on top and recognizable circular ridges on the bottom, a metal pizza tray[5] with notches, a wooden handle metal pizza cutter, and a recipe, use, and care book.

Sassafras does not claim a protectible interest in the packaging of its set.

### Trade Dress Protection

■ Relief for trade dress infringement under Lanham Act § 43(a) hinges on a plain-

---

1. This Court's earlier opinion (889 F.Supp. 343 (N.D.Ill.1995)) dismissed Count VI of Sassafras' Complaint—a copyright infringement claim based on the recipe, use and care booklets sold with each party's pizza stones.

2. As to Count V, Roshco Mem. 1 & n. 2 reflect that Sassafras' counsel had indicated the withdrawal of that claim (because the parties are direct competitors, the anti-dilution statute that forms the gravamen of that claim simply does not apply—see *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir.1993) and cases cited there). Sassafras' response has not questioned either Roshco's assertion or the state of the law. Accordingly Count V is dismissed on substantive grounds.

3. This District Court has adopted General Rule ("GR") 12(M) and 12(N) to facilitate the disposition of Rule 56 motions by identifying the existence or nonexistence of material factual issues. What follows is not of course a set of this Court's factual findings, but rather a scenario that cred-

its the pro-Sassafras evidence with the required reasonable inferences. Roshco's GR 12(M) statement was not really controverted by Sassafras—though it purported to deny only one of Roshco's paragraphs, that paragraph actually covered a fact to which the parties had stipulated. In any event, citations to Roshco's statement will take the form "D. 12(m) ¶ —;" while pages in its Appendix will be cited "D.App. —." Sassafras' Exhibits will be cited "P.Ex.—."

4. Because Roshco's motion challenges only Sassafras' ability to establish a protectible interest in the trade dress of its set, the degree of similarity between the two sets is not relevant as such for purposes of the disposition of this motion.

5. Although that portion of Sassafras' Brief refers to a "tray," the item is more commonly referred to as a "rack," and that is the term this opinion will employ.

**4**

tiff's proof (1) that its trade dress is legally protectible and (2) that its trade dress was indeed infringed (*Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir.1994)). Roshco's motion challenges Sassafras' ability to clear the first hurdle.

■ "Trade dress" has been defined as "the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques" (*Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989) (citation and internal quotation omitted)). While traditional notions in this area covered only the packaging or labeling of a product, protection is now potentially available for the appearance of the product itself, sometimes referred to as "product configuration" (1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ["McCarthy"] § 8.01[3] (3d ed. 1995); see also Judge Edward Becker's illuminating opinion in *Duraco Prods., Inc. v. Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1438–51 (3d Cir.1994), discussing the potential differences in the legal principles that apply to product configuration cases as compared with other more traditional trade dress situations); cf. *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 635–36 (7th Cir. 1993) (addressing the potential trademark, rather than trade dress, protection of product configuration).

■ But as with trademarks and service marks, a product's appearance is entitled to trade dress protection only if that appearance serves as a signifier of the product's source (*Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657–58 (7th Cir.1995)). Otherwise competitors are free to copy the product's configuration down to the minutest detail, no matter how unique or original that product may be. Trade dress law has no interest in stopping that "sincerest of flattery," [6] because that branch (or subbranch) of intellectual property law is concerned with protecting "goodwill toward the producer" and not "goodwill toward the article—'the attractive features, of whatever nature, that the product holds for consumers'—which is freely appropriable by second comers" (*Thomas & Betts*, 65 F.3d at 660–61, quoting *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 215 (3d Cir.1995)). As *Duraco*, 40 F.3d at 1448 has put the matter:

> It is not *ipso facto* "unfair competition," we believe, for one boldly to copy a competitor's product; it is only "unfair competition" to trade off another's good will and in the process dupe customers into mistaking one's product for another's.

So in this case Roshco is free to sell a pizza set that mimics the Sassafras set to a "T"— round, brownish pizza stone, wooden-handled cutter and all—unless Sassafras is able to show [7] that the appearance of its set is entitled to trade dress protection because it serves as a signifier of the set's source. To do that Sassafras must show that the configuration of its pizza set is either (1) inherently distinctive or (2) has acquired distinctiveness through secondary meaning (*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992)).

*Inherent Distinctiveness*

■ Some trademarks and trade dresses are deemed "inherently distinctive" and hence entitled to protection "because their intrinsic nature serves to identify a particular source of a product" (*Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757; see also *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir.1995) (a product's trade dress features are inherently distinctive when they "almost automatically tell a customer that they refer to a brand")). Although it has been noted that inherent distinctiveness is less likely to be present where the appearance of the product itself is at issue (see *Kohler*, 12 F.3d at 641 n. 11, citing

---

6. Charles Colton, *The Lacon*, vol. 1, no. 217.

7. Of course, in the present summary judgment context Sassafras' burden is not to "show" or "prove" or "establish" anything. Instead its burden is the lesser one of creating a genuine issue of material fact (after it has been given the benefit of reasonable inferences) as to each of the substantive areas dealt with in this opinion. This Court consistently applies that standard here, even though this opinion occasionally employs the more stringent-sounding language just as a matter of convenience, to avoid (1) the alteration of quotations from the case law or (2) the constant awkward repetition of the "genuine issue of material fact" phraseology.

1 McCarthy § 7.23[2]; *Duraco*, 40 F.3d at 1449–51), it is obviously not impossible for a product's configuration to be inherently distinctive. However, it is worth mentioning at the outset that Sassafras' burden as to inherent distinctiveness is not an easy one—it must show that a reasonable jury could conclude that the configuration and appearance of the Sassafras set would almost automatically be perceived by buyers as an indicator of the source of the set.

Our Court of Appeals has not explicitly adopted its own specific test for inherent distinctiveness in product configuration trade dress.[8] Other courts have used a few different variations (see *Duraco*, 40 F.3d at 1448–49; *Nelson/Weather-Rite, Inc. v. Leatherman Tool Group, Inc.*, No. 93 C 2274, 1995 WL 669091, at *8 (N.D.Ill. Nov. 8)). But in all events the tests and the elements within each test (1 McCarthy § 8.02[4]) (footnote omitted):

> are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicia [sic] of origin—a trademark.

■ As already stated, Sassafras claims a protectible trade dress in a round brownish stoneware pizza stone with circular ridges on the bottom, a metal rack with notches, a wooden-handled metal pizza cutter and a recipe, use and care book. Of course this Court continues to recognize that "[t]rade dress infringement claims call for consideration not of each facet of the claimed trade dress separately, but rather of their combined effect" (see its opinion in *Spraying Sys. Co. v. Delavan, Inc.*, 762 F.Supp. 772, 782 (N.D.Ill. 1991), *aff'd*, 975 F.2d 387 (7th Cir.1992)). But in this instance Sassafras is seeking trade dress protection for a combination of four distinct elements, so that it will be helpful to discuss each individually before turning to the set as a whole.

Sassafras' pizza stone is round and light brown in color. On one side—the side on which the pizza is placed—the surface is smooth, but the flipside has raised ridges in a pattern of four concentric circles, each broken up into eight segments (D.App. 58; P.Ex. F). Of course there is nothing out of the ordinary about the shape or color, so the only arguably distinctive aspect of the pizza stone might be the raised ridges on its underside (Roshco's stone looks much the same, except that each concentric ridge is broken up into four rather than eight segments).

On looks alone it is difficult to see how that ridge pattern is so distinctive as to be characterized as a source-indicator as opposed to mere ornamentation (see, e.g., 1 McCarthy §§ 7.06–7.12, discussing the inherent distinctiveness of designs, symbols and shapes). Further, any claim that the pattern inherently serves a source-identifying function is also weakened for two other reasons:

1. That general pattern appears to be common in the industry—Kitchen Supply Co. has sold a pizza stone with raised circular ridges since 1983, and Old Stone Oven Company (Kitchen Supply's predecessor) sold a stone with a similar circular ridge pattern even before that and probably as early as the mid-70s (D. 12(m) ¶ 20; D.App. 42–47, 108–18). In fact, pizza stones with similar ridges are readily available "market items" purchasable in Taiwan (D.App. 8–12; P.Ex. B at 21–25)—see *Duraco*, 40 F.3d at 1449 ("designs customary in the industry cannot be inherently distinctive (nor for that matter can they acquire secondary meaning)").

2. There is no evidence that Sassafras uses the same pattern on any of its other products or that it ever intended to use, or currently uses, the pattern to identify its product as a Sassafras product—see *id.* at 1450 ("a source's intent in adopting the particular configuration is highly proba-

---

8. In the ordinary trademark or trade dress context, courts have used the classic formulation set out by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) to separate the inherently distinctive from the rest of the pack (see *Two Pesos*, 505 U.S. at

768–69, 112 S.Ct. at 2757–58). But that taxonomy really does not help much when the appearance of the product itself is at issue (see *Duraco*, 40 F.3d at 1440–42, cited with approval in *Thomas & Betts*, 65 F.3d at 658 n. 3).

tive").[9] For example, the pattern is not pictured on the packaging of the Sassafras set (D.App. 55), and it does not appear (in fact it is not even mentioned) in any of the Sassafras advertising samples submitted by either party (D.App. 74–107; P.Ex.D).

Sassafras' rack is nothing more than a simple piece of thick metal wire shaped as a holder for the pizza stone. It is used to carry the stone from the oven to the table (D.App. 25, 56, 60; P.Ex. F). Sassafras asserts that the rack alone is distinctive, primarily because of its "notches." That really stands trade dress law on its head—if true, it would be a real challenge to devise a product that is not distinctive.

Sassafras' wooden-handled pizza cutter merits little discussion, for there is nothing that makes it distinctive in a way that separates it from other pizza cutters—it is really quite plain and common looking (D.App. 59; P.Ex.F). Likewise, the recipe, use and care booklet is nothing more than an ordinary instruction pamphlet, not different looking in any relevant respect from those sold with many household products (D.App. 56, 61).

Is there something about the combination of those non-distinctive items that makes the Sassafras set more distinctive as a whole than the sum of the non-distinctive parts? Of course not. This is not a striking or unusual combination. Each element of the set is there because it serves a purpose—the stone holds the pizza, the rack holds the stone, the cutter cuts the pizza, and the recipe, use and care booklet tells "how to." It may well be a unique, handsome and desirable combination, but as *Duraco,* 40 F.3d at 1450 has said:

> The inquiry here does not duplicate that employed for secondary meaning; instead of focusing on consumers' actually acquired mental associations, the inquiry focuses on whether a consumer would likely perceive the feature or combination or arrangement of features as something that renders the

product intrinsically more desirable regardless of the source of the product, or primarily as a signifier of the product's source.

It frankly requires an extraordinary stretch of the imagination to picture any prospective buyer looking at the Sassafras set and automatically perceiving its appearance as an indicium of origin—such a stretch that this Court holds confidently that no reasonable jury could find that the appearance of the Sassafras set is inherently distinctive.

*Secondary Meaning*

Trademarks or trade dresses that are not inherently distinctive can still be entitled to protection if they have acquired distinctiveness through secondary meaning (*Two Pesos,* 505 U.S. at 769, 112 S.Ct. at 2757). In the ordinary trademark or trade dress situation " 'secondary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself' " (*Qualitex Co. v. Jacobson Prods. Co.,* —— U.S. ——, ——, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995), quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). But that formulation makes less sense in a product configuration case where the appearance of the product is itself the thing for which trade dress protection is sought (*Thomas & Betts,* 65 F.3d at 658, citing *Duraco,* 40 F.3d at 1431, 1440–41). In such a case the critical issue shifts from the primary meaning of a particular signifier to "whether a product feature's primary significance to consumers is as an identifier of source or as an element which contributes to the inherent appeal of the product" (*Thomas & Betts,* 65 F.3d at 658). So the key question here is whether Sassafras can show that in the minds of purchasers the appearance and configuration of its set (round, brownish pizza stone, rack,

---

9. Sassafras came to use its current pattern of raised "drying ridges" at least in part because they serve a purpose: the ridges and ridge configuration help to dry the stone. And even though other designs were considered by Sassafras, and there may be other ridge patterns that could achieve the same drying effect, there is nothing to suggest that the ridge pattern was adopted as a source-identifier, rather than simply as an aesthetically pleasing way to arrange the drying ridges (P.Exs. C, G; D.App. 22–23).

cutter and pamphlet) in fact primarily serves as an identifier of the set's source.

▮ While there may be many ways to prove that a claimed trade dress possesses the requisite source-identifying function, *Echo Travel, Inc. v. Travel Assoc., Inc.*, 870 F.2d 1264, 1267 (7th Cir.1989) has enumerated several factors that may be relevant:

*Direct Evidence*

(a) direct consumer testimony

(b) consumer surveys

*Circumstantial Evidence*

(c) exclusivity, length, and manner of use

(d) amount and manner of advertising

(e) amount of sales and number of customers

(f) established place in the market

(g) proof of intentional copying

Because the parties have chosen to structure their memoranda by addressing those factors in turn, this opinion too will take that route. It is important to remember, however, that such factors are relevant only insofar as they help to resolve the dispositive question: Could a reasonable jury find that in the minds of consumers or other potential buyers the *primary significance* of the configuration and appearance of the Sassafras set is to identify its source?

*(a) Direct Consumer Testimony and (b) Consumer Surveys*

▮ To begin with, Sassafras Mem. 2 contends that because it does not sell its sets directly to the consuming public, consumers are not a part of the "relevant market" that should be considered in examining secondary meaning. That contention is really misguided, because Sassafras products are primarily sold to retailers for resale to consumers under the Sassafras name (P.Ex. A 50).[10] As a short stroll through any local mall quickly demonstrates, almost all products intended for consumer use are not sold directly by their producers, but are first shipped off to distributors or retailers. Why should that first stopoff in the stream of commerce be the only relevant one?

Sassafras' initial sales to distributors or retailers do not alter the fact that the sets are ultimately sold to the consumers who are the real target group for the product—a home pizza making set. As *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987) puts it:

> The focus of secondary meaning therefore is the consuming public. Hence, so must be the inquiry into whether the mark owner has a protectible interest.

At most the distribution chain makes the distributors and retailers *also* part of the relevant class of buyers, so that 2 McCarthy § 15.14[2] (footnotes omitted) explains:

> In most cases, the relevant buyer class consists of consumers. Therefore, the state of mind of wholesale or retail distributors or their opinions about consumers, is often rejected as irrelevant. However, if the relevant buyer class consists of *both* dealers and ultimate consumers, then the state of mind of the dealers is obviously important.

▮ But in any event Sassafras has failed utterly to produce any evidence from which a reasonable jury could conclude that its set has acquired secondary meaning in the minds of *any* group of prospective buyers—consumers, wholesalers, distributors or retailers. It is not simply that it has offered no evidence whatever (a recurrent, and ultimately fatal, theme throughout its response to Roshco's motion) in the form of consumer testimony or consumer surveys, choosing instead to lean on its just-discussed misguided theory that consumers' reactions to the product's trade dress are irrelevant. Beyond that delinquency, Sassafras has also submitted no testimony from or surveys of the groups that it does deem relevant—distributors, wholesalers or retailers. Its sole evidentiary tender that even purports to touch on such factors is the affidavit of Victor Michalek ("Michalek")

10. Contrast the situation in *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 858 F.Supp. 361, 367 (E.D.N.Y.1994), *aff'd*, 65 F.3d 1063 (2d Cir. 1995), where the product was sold exclusively in the wholesale market to private label resellers.

(P.Ex.E), a co-owner of a sales representative company that acts in that capacity for Sassafras and others. Michalek says:

> At trade shows and other display situations, buyers and others coming across the pizza stone set displayed by Roshco, Inc. would think of Sassafras without further detailed examination.

That assertion faces a threshold difficulty in terms of its very admissibility: Michalek's business experience might perhaps qualify him as an "expert" under Fed.R.Evid. 702 on some matters having to do with pizza stones (although even that is not really established on the record before this Court), but there is surely nothing to suggest his qualifications as a mindreader. Simply put, he has not been shown to be capable of testifying as to the mental reactions that *other* persons would have on seeing Roshco's product. Because his conclusory testimony in that respect would be inadmissible in evidence, that aspect of his affidavit is to be ignored under Rule 56(e) (see, e.g., *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1204 (7th Cir.1995)).

Even aside from that fatal flaw, the Michalek statement is problematic in its own terms.[11] For one thing, it says nothing as to the basis for his expression of other people's views (see, e.g., *Centaur Communications*, 830 F.2d at 1223). Even more fundamentally, Michalek's statement does not focus on the key inquiry identified in *Thomas & Betts*, 65 F.3d at 658–59:

> It is not enough that the consumers associate the form of the product with a particular producer. Such an association is inevitable when the first comer is the exclusive producer under a patent.[12] Consumers must also care that the product comes from a particular producer (though they need not be able to identify him) and must

desire the product with the particular feature because it signifies that producer.

In sum, even if the Michalek affidavit were admissible evidence (as it is not), it would not get Sassafras where it needs to be in terms of the "more stringent 'primary significance' standard" (*id.* at 661 n. 8, citing *Qualitex*, —— U.S. at ——, 115 S.Ct. at 1303 and *Two Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. at 2756 n. 4; *Vornado*, 58 F.3d at 1502 n. 7) ("what the court actually found was just an association between the grill design and Vornado, not that the primary significance of the design in the consumer's mind was as a brand identifier, rather than as a grill type").

*(c) Exclusivity, Length and Manner of Use*

It has already been said that Sassafras has been selling its sets since the late 1970s or early 1980s. No one else had sold a set with the same configuration until the last few years, when in 1993 Sassafras began to provide its pizza set components to retailers Crate & Barrel and Sam's Club, who then marketed sets under private label trademarks (D.App. 143; P.Mem. 3).[13] Roshco began selling its own set in 1994.

Sassafras' entry into private labeling arrangements itself casts a degree of doubt on its assertion of secondary meaning. As 1 McCarthy § 8.02[5] explains:

> When a product shape or design is sold by the authority of plaintiff under several different word marks (*e.g.*, by "private labelling" for others), it is more difficult for plaintiff to prove acquisition of secondary meaning—that is, that the shape or design identifies a *single* source.

It is true that the private label arrangements represent less than 10% of Sassafras' total sales (D.App. 107, 143) and that while the Crate & Barrel and Sam's Club sets are packaged differently from the Sassafras set,

---

11. This is also quite apart from the suspect nature of the statement stemming from Michalek's interested status as Sassafras' sales representative, something that would cause his views as to secondary meaning to be discounted if this Court were involved in weighing evidence (as it is not in the present Rule 56 context)—see, e.g., *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1023–24 (7th Cir.1979).

12. [Footnote by this Court] While it is true that Sassafras was not producing its set under a patent, it was (as will be discussed below) the "first comer" and "exclusive producer" of this particular pizza set configuration for a period of time.

13. Apparently Sassafras sells the individual components of its set to Crate & Barrel and Sam's Club, each of which then arranges and packages the sets as its own.

the individual items in those sets are labeled with the Sassafras logo (P.Ex.C). But those factors merely tend to moderate the negative impact of Sassafras' private labeling efforts on any potential proof of secondary meaning (1 McCarthy § 8.02[5], at 8–18.3).[14]

What is far more damaging to Sassafras' claim is the already-discussed and yet-to-be-discussed vacuum that exists in place of any hard evidence of secondary meaning. After all, a party's time and exclusivity of use merely provide the opportunity to build source identification in the public mind. Those factors not only fail to provide any assurance that the opportunity has actually produced that result, but they alone do not even create the reasonable inference that such is the case—see, e.g., *Walt-West Enter., Inc. v. Gannett Co.,* 695 F.2d 1050, 1060 (7th Cir.1982), holding that a radio station's use of a term (its FM frequency) in its promotions over a period of 10 years plus its expenditure of large sums on advertisements containing that term were "simply not germane" because the plaintiff could not show that the way in which it employed the term led listeners to "regard the primary significance of the term as designating a single, though perhaps anonymous, source...."

In this instance Sassafras has furnished no evidence that it was the exclusive seller of pizza stones or racks or pizza cutters or pamphlets for any period of time—its only potential claim to fame lies in its exclusive sale of the particular combination of products. And just as has earlier been discussed during this opinion's treatment of inherent distinctiveness, a party's status as the sole seller of a particular combination of relatively ordinary items does not demonstrate a secondary meaning in that combination.

### (d) Amount and Manner of Advertising

If anything, this factor cuts sharply against Sassafras' claim of secondary mean-ing: There is no evidence that Sassafras has done *anything* to call attention to what it now claims as its trade dress. For one thing, the Sassafras set is sold in a box (D.App. 55) that does not even contain a likeness of Sassafras' alleged trade dress. Thus a consumer would not even know what the set looked like until he or she opened up the package. For another, the samples of Sassafras catalogs in evidence (D.App. 74–106; P.Ex.D) show that Sassafras does *nothing* to emphasize the configuration at issue in this case— at best the package, along with many other Sassafras products, is photographed and its component parts are photographed and listed in a cursory fashion. As this Court has observed in *Ohio Art Co. v. Lewis Galoob Toys, Inc.,* 799 F.Supp. 870, 883 (N.D.Ill. 1992):

> Secondary meaning cannot be established by advertising that merely pictures the product and does nothing to emphasize the mark or dress.

Sassafras has made no showing that it has attempted to create, or has done anything that might engender, an impression of secondary meaning in the minds of purchasers as to its pizza stone set.

### (e) Amount of Sales and Number of Customers; (f) Established Place in the Market

It is worth repeating that evidence of any of the several factors helps Sassafras only if it tends to make the existence of secondary meaning more likely than it would be without the evidence. On the subjects now under consideration, Sassafras's annual sales of pizza stones alone are not probative, for the issue relates to the claimed trade dress protection of the *combined* products marketed as a set. On that score Sassafras' sales figures do not provide any direct information, but Roshco Mem. 13 has explained why the maximum possible number of such sets

---

**14.** Relatedly, although Sassafras seeks trade dress protection for the specific combination of elements that make up its own set, it licensed still another company, Fairsound Corp. ("Fairsound"), to produce a similar set (containing not only the items found in the Sassafras set but also a metal pizza pan and a wooden spatula-type utensil) (D. 12(m) ¶ 22; D.App. 31–33, 66–73; P.Mem. 4) under Fairsound's own trademarks. Indeed, Sassafras exercises no quality control over the Fairsound product (D.App. 30), something that can destroy the validity of a trademark as a designator of source. It is somewhat of an understatement to say that the just-described aspects of Sassafras' conduct do not help its cause here.

would average out to fewer than 16,000 per year over the eight-year period covered by Sassafras' figures, and Sassafras Mem. 5–6 does not quarrel with that. Instead Sassafras seeks to emphasize that its set represents approximately 90% of the national market share for "such" sets (not surprising, given the already mentioned fact that Sassafras was until recently the only maker of this particular configuration) and 60–70% of the national market share for pizza stones (P.Ex. E). Simply put, those numbers do not at all provide the requisite showing, as the case law has analyzed the issue, that the "primary significance" to buyers of the configuration of the Sassafras set is to identify its source.

### (g) Proof of Intentional Copying

*Thomas & Betts,* 65 F.3d at 663 teaches:

Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's.

Accord, *Duraco,* 40 F.3d at 1453 ("attempts to copy a product configuration will quite often not be probative: the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse customers as to the source of the product"). Here the record shows that Roshco's president Sheldon Stone ("Stone") was aware of Sassafras' pizza stone product line and that he knew Sassafras was a "well known company within the industry" when he went to Taiwan to visit with a trading company that sold components such as pizza stones, racks, pizza cutters and use and care books (P.Ex.B at 33). Stone's deposition demonstrates that the pizza stone—including the circular ridges on the bottom—was sold to him by the Taiwanese trading company as a "market item" generally available to any purchaser, that the rack was purchased in the same fashion and was one of many similarly shaped racks and that the pizza cutter was also purchased from that same trading company (P.Ex.B).

At most that evidence could support an inference that Stone intended to capitalize on the desirable features of a successful combination. But there is absolutely nothing to suggest any intent to confuse customers as to the source of the product, and Sassafras has not adduced any facts that could raise such an inference. In fact the packaging of the products is quite different in appearance (with no similarity at all in the products' trade names) (D.App. 55, 137), the use and care booklets look nothing alike (D.App. 61, 142) and the Sassafras pizza cutter is mounted on a red and white checkerboard patterned piece of what looks like cardboard, while the Roshco pizza cutter is sold without any such mounting (D.App. 56, 138). All of that undercuts any claim that Roshco intended to pass off its set as that of Sassafras (see *Thomas & Betts,* 65 F.3d at 663). *Libman Co. v. Vining Indus., Inc.,* 69 F.3d 1360, 1363 (7th Cir.1995) has framed matters in a way that (though voiced in the likelihood-of-confusion context) could readily be adapted for this case:

So far as appears—and it is all that the record supports—Vining noticed that Libman's brooms were selling briskly, inferred that consumers like brooms with contrasting color bands, and decided to climb on the bandwagon. We call that competition, not bad faith, provided there is no intention to confuse, and so far as appears, there was none.

### *Summary as to Secondary Meaning*

*Duraco,* 40 F.3d at 1453 has recapitulated the burden of a party in Sassafras' situation:

In sum, secondary meaning in a product configuration case will generally not be easy to establish.

That difficulty becomes monumental when as here the plaintiff fails to produce *evidence* to support its contention that its product combination's trade dress is entitled to protection. Even if Sassafras had to show nothing more than some buyers' association of the pizza set's appearance with Sassafras, it would still lose on this record.[15] A fortiori Sassafras falls far short of meeting the "more strin-

---

**15.** Only two factors could even arguably support Sassafras' position, and one of those (the Michalek affidavit) is inadmissible. That effectively leaves as the sole admissible evidence the fact that Sassafras alone has sold this particular combination for over a decade, and that alone is insufficient even to produce a reasonable inference of secondary meaning.

gent," and actual, "primary significance" standard (*Thomas & Betts,* 65 F.3d at 661 n. 8). It must be concluded that no reasonable jury could find that in the minds of consumers or other potential buyers the "primary significance" of the configuration and appearance of the Sassafras set is to identify its source—or in terms of the legal rubric, that the Sassafras set has acquired secondary meaning.

### State Law Claims

Sassafras' state law claims are based on the same allegations as its federal Lanham Act claim, as to which this opinion has held it does not have a protectible trade dress in its pizza set. Hence its state law claims under the Consumer Fraud and Deceptive Trade Practices Act (Count II) and the Uniform Deceptive Trade Practices Act (Count III) also fall, because it has no basis for invoking those statutes absent a protectible trade dress (*Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983); *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D.Ill.1994)). Sassafras' Deceptive Advertising Act claim (Count IV) cannot stand for the added reason that the Act is a criminal statute and does not provide for a private right of action. Finally, Sassafras' dilution claim under Trademark Registration Act § 15 (Count V) has already been dismissed (see n. 2), but even were that not the case it would still fail because without a protectible trade dress there is nothing to dilute (see *Gimix,* 699 F.2d at 908; *Spex,* 847 F.Supp. at 579).

### Conclusion

Roshco has met its burden of establishing that there is no genuine issue of material fact, because no reasonable jury could conclude that the configuration of the Sassafras set is inherently distinctive or has acquired secondary meaning. Sassafras' related state law claims also fail as a matter of law. Thus

Roshco is entitled to a final judgment as a matter of law, and this action is dismissed with prejudice.[16]

16. This opinion has dealt with the issues much more extensively, and with a great deal more parsing of the relevant authorities, than either side's submissions. This comment should not be viewed as a criticism of the litigants' input so much as a recognition of the credit to be given to the high quality of work provided (as usual) by this Court's able law clerk, John Boundas, Esq. Having said that, this Court is quick to add that its word-by-word editing and revision of his draft opinion means (again as always) that if any errors are found in this opinion, they are the sole responsibility of this Court and not of its first-rate clerk.