MARKETING DISPLAYS, INC., Plaintiff,

v.

TRAFFIX DEVICES, INC., Defendant.

Civil Action No. 95–40230.

United States District Court,
E.D. Michigan,
Southern Division.

June 12, 1997.

Order Denying Reconsideration
July 9, 1997.

John A. Artz, Frank A. Angileri, Brooks & Kushman, Southfield, MI, for Marketing Displays, Inc.

Jeanne–Marie Marshall and Richard W. Hoffman, Reising, of Ethington, Barnard, Perry & Milton, Troy, MI, for Traffix Devices, Inc.

## MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

Before the court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff, Marketing Displays, Inc. ("MDI") and defendant, TrafFix Devices Inc. ("TrafFix"), filed their respective motions on February 28, 1997. This court heard oral argument on May 28, 1997. For the reasons set forth below, this court will grant TrafFix's motion for summary judgment and deny MDI's motion for summary judgment.

## Background

MDI manufactures and sells, *inter alia,* spring-mounted wind-resistant sign stands. MDI has been manufacturing and selling these sign stands since 1968 under the trade-mark WINDMASTER. The first sign stand sold under the WINDMASTER mark was a business-type wind-resistant sign stand that was used to display advertisements, such as those seen at gas stations.

In the mid 1970's MDI modified its business-type wind-resistant sign stands in order to utilize the wind-resistant concept for traffic warning signs. The traffic-type wind-resistant sign stands were used to hold signs such as "ROAD WORK AHEAD" and "ROAD CONSTRUCTION AHEAD". These traffic-type, spring-mounted wind-resistant sign stands were then sold under the same mark WINDMASTER in the traffic control field.[1]

MDI's WINDMASTER sign stands have been protected by two utility patents: United States Patent Number 3,646,696 and 3,662,482 (hereinafter the " '696" and " '482" patents, respectively). In obtaining the '696 patent MDI argued, before the United States Patent Office, that its dual spring design had benefit over the prior art. Moreover, MDI has, on at least one occasion, brought suit to enforce those patents against an alleged infringer who was manufacturing a sign stand containing a dual spring configuration like the one at issue here. In that 1978 case,[2] MDI succeeded in obtaining an injunction against the infringer from manufacturing such a dual spring design.

MDI has also granted patent licenses to third-parties having the dual spring configuration at issue here. For instance, MDI licensed Eastern Metal, under its utility patents, to sell sign stands incorporating the dual spring configuration at issue here in exchange for royalties and rights to use Eastern Metal's patents. Upon expiration of MDI's patents in 1989, Eastern Metal stopped paying royalties.

While the '696 and '482 patents were in force, MDI clearly and consistently marked its sign stands with the patent numbers which served to put the public on notice of MDI's rights. In addition, MDI has consistently identified those patents in its WINDMASTER product literature.

The WINDMASTER line of stands has enjoyed commercial success, selling over twenty million dollars to date. In 1986, Jack Kulp founded TrafFix to manufacture and sell traffic-type sign stands and related products. Thereafter, TrafFix sent one of MDI's WINDMASTER sign stands to Korea to be "reverse engineered." TrafFix effectively copied the WINDMASTER sign stand as the product configurations of the parties' products are virtually identical. (See Figure 1). In 1994, TrafFix began selling that product under the WINDBUSTER trade name. Thereafter, on July 11, 1995, MDI filed the instant action.

MDI brought this action against TrafFix alleging that TrafFix's WINDBUSTER spring-mounted wind-resistant sign stands infringed upon MDI's WINDMASTER trademark and trade dress rights and constituted unfair competition, pursuant to the Lanham Act.

On January 13, 1997, this court, by memorandum opinion and order[3], granted MDI's motion for summary judgment that MDI's WINDMASTER trademark was infringed by TrafFix's use of the confusingly similar mark WINDBUSTER in connection with traffic sign stands. The parties now seek summary judgment as to the issue of whether MDI's alleged trade dress rights in its dual spring configuration sign stands is being infringed

---

1. In 1987, MDI introduced an orange corrosion-coated steel version of its traffic sign and sold it under the mark STEELMASTER. Since STEEL-MASTER is otherwise identical to the WIND-MASTER and is, in fact, part of the WINDMAS-TER line of products, this court, for purposes of this opinion, will refer to the WINDMASTER and STEELMASTER products collectively as "WIND-MASTER".

2. *Sarkisian v. Winn–Proof, Corp.,* 203 U.S.P.Q. 60 (D.Or.1978) *aff'd in part, rev'd in part,* 686 F.2d 671 (9th Cir.1981).

3. That opinion was non-substantially amended on May 29, 1997.

by TrafFix's dual spring configuration sign stand.[4,5]

Specifically, MDI asserts that it has trade dress rights in its WINDMASTER sign stand which is comprised of:

(a) a relatively narrow base member;

(b) a pair of vertically arranged closely spaced coil springs attached to the base member;

(c) a plurality of leg members attached to the base member and extending therefrom at angles thereof;

(d) an upright member attached to the coil springs; and

(e) a sign attached to the upright member.

For the purposes of this opinion, however, this court finds that the only element of the alleged trade dress at issue is the pair of vertically arranged closely spaced coil springs (hereinafter "dual spring configuration" or "dual spring design").[6] *See discussion infra,* pg. 273.

### *Legal Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Martin v. Ohio Turnpike Commission,* 968 F.2d 606, 608 (6th Cir.1992); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *60 Ivy Street Corporation v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). The court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). In other words, the disputed fact must be one which might affect outcome of the suit under the substantive law controlling the issue. *Henson v. National Aeronautics and Space Administration,* 14 F.3d 1143,

4. Since this court previously granted MDI summary judgment on Count I (Federal Trademark Infringement) of MDI's four count amended complaint and dismissed, by order dated September 7, 1995, Count III (common law unfair competition) and since Count IV (Federal Unfair Competition) is governed by the same facts as Count II (Trade Dress Infringement), summary judgment at this time as to Count II would effectively resolve all of the remaining issues in this case. *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 849 F.2d 1012, 1015 (6th Cir.1988) (finding that the same facts can support both trademark infringement and unfair competition under § 43(a)).

Moreover, while it is axiomatic that this court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where both parties have filed cross motions for summary judgment, *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991), where, as here, both parties proceed on the same legal theory and rely on the same material facts, the court is signaled that the case is ripe for summary judgment. *Shook v. United States,* 713 F.2d 662, 665 (11th Cir.1983). *See also Bricklayers, Masons and Plasterers International Union v. Stuart Plastering Co.,* 512 F.2d 1017, 1023 (5th Cir.1975) (Cross motions for summary judgment may be probative of the nonexistence of a factual dispute).

5. Although Traffix's instant motion is styled as a motion for summary judgment as to functionality rather than as to trade dress, it will have the same dispositive effect as a motion for summary judgment as to trade dress if this court finds that the dual spring configuration is functional. *See* discussion of applicable Law, *infra,* p. 266.

6. MDI effectively concedes this finding in its brief in support of its motion for summary judgment wherein it says: "... purchasers and persons in the traffic control industry associate MDI's product configuration—*the dual spring design*—with MDI." MDI's Brf. at p. 3. (emphasis added).

1148 (6th Cir.1994). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Accordingly, where a reasonable jury could not find that the non-moving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Feliciano v. City of Cleveland,* 988 F.2d 649 (6th Cir. 1993).

Once the moving party carries its initial burden of demonstrating that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the non-moving party must present more than just some evidence of a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986):

> There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Consequently, the non-moving party must do more than raise some doubt as to the existence of a fact; the non-moving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991).

### Applicable Law

Section 43 (a) of the Lanham Act which creates a civil cause of action for trademark infringement provides, in relevant part, that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The protection against infringement provided by section 43(a) includes the unregistered "trade dress" of an article. *Two Pesos, Inc., v. Taco Cabana, Inc.,* 505 U.S. 763, 765 n. 2, 112 S.Ct. 2753, 2756 n. 2, 120 L.Ed.2d 615 (1992); *Esercizio v. Roberts,* 944 F.2d 1235, 1238 (6th Cir. 1991).

To prove a trade dress violation in contravention of section 43(a), a plaintiff must show, by a preponderance of the evidence: 1) that the trade dress has obtained "secondary meaning;" 2) that the trade dress of the two competing products is confusingly similar; and 3) that the appropriated features of the trade dress are primarily non-functional. *Esercizio,* 944 F.2d at 1239; *Kwik–Site Corp. v. Clear View Mfg. Co. Inc.,* 758 F.2d 167, 178 (6th Cir.1985).

### a. Secondary Meaning

The trade dress of a product may be identified in one of two ways. A product's trade dress may be inherently distinctive or it may acquire secondary meaning through the consumer associating the trade dress with the product's source.[7] *Two Pesos, Inc.,* 505 U.S. at 769, 112 S.Ct. at 2757–58. Secondary meaning is established when "[i]n the minds of the public, the *primary significance* of a product feature or term . . . identif[ies] the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct.

---

7. MDI has offered only a conclusory argument that the trade dress of its WINDMASTER sign stand is inherently distinctive. Accordingly, this court finds that the WINDMASTER sign stand is not inherently distinctive and, therefore, will only address the issue of secondary meaning.

2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (emphasis added). The Sixth Circuit Court of Appeals has stated that:

> To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

*Esercizio,* 944 F.2d at 1239 (citing *West Point Mfg. Co. v. Detroit Stamping Co.,* 222 F.2d 581, 595 (6th Cir.) *cert. denied,* 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955)). In a trade dress action, the ultimate issue is whether "[a] product feature's *primary significance* to consumers is as an identifier of source or as an element which contributes to the inherent appeal of the product." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 659 (7th Cir.1995) (emphasis added). In other words, for our purposes, the question is whether the pair of vertically arranged closely spaced coil springs of the MDI WINDMASTER sign stand primarily serves as an identifier of the sign stand's source.

 In order to better evaluate MDI's claim of the existence of secondary meaning in the trade dress of its WINDMASTER product, this court will employ the seven part test used in *Sassafras Enterprises, Inc. v. Roshco, Inc.,* 915 F.Supp. 1 (N.D.Ill.1996). In *Sassafras,* the district court identified the following factors for consideration in determining the existence of secondary meaning in a trade dress action: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Id.* at 7 (citing *Echo Travel, Inc. v. Travel Assoc., Inc.,* 870 F.2d 1264, 1267 (7th Cir.1989)). *Cf. Blockbuster*

*Entertainment Group v. Laylco, Inc.,* 869 F.Supp. 505, 510 (E.D.Mich.1994).[8] These factors, however, are significant only to the extent that they help this court resolve the ultimate issue, to wit: could a reasonable fact finder conclude that in the minds of consumers the *primary significance* of the dual spring configuration is to identify MDI as the source of the WINDMASTER sign stand. *See Sassafras,* 915 F.Supp. at 7.

### 1. Direct Consumer Testimony

In support of this factor, MDI offers the deposition testimony of John McKenny, an engineer who is TrafFix's expert; Walt Kuczera, one of TrafFix's principals; and Cecil Upsprung, a former marketing manager for MDI. These deponents testified that they could recognize an MDI WINDMASTER sign stand while driving by one on the highway. None of these deponents, however, are consumers of sign stands. Instead, the consumers of sign stands are professional purchasers. As Prof. McCarthy states: "[t]he meaning of a term to a non-purchasing segment of the population is neither relevant nor important." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.20 (4th ed.1996) (hereinafter "McCarthy on Trademarks"). As such, this deposition testimony does not establish the requisite "primary significance" of the dual-spring design as a brand identifier in the consumer's mind. *See Vornado Air Circulation Systems v. Duracraft Corp.,* 58 F.3d 1498, 1502 n. 7 (10th Cir.1995). Accordingly, this factor favors TrafFix.

### 2. Consumer Surveys

Neither MDI nor TrafFix provides survey evidence. While such evidence is not required in trademark cases, *see Committee for Idaho's High Desert Inc., v. Yost,* 92 F.3d 814, 39 U.S.P.Q.2d 1705, 1711 (9th Cir.1996); *Charles Jacquin et Cie, Inc., v. Destileria Serralles, Inc.,* 921 F.2d 467, 17 U.S.P.Q.2d 1104, 1110 (3d Cir.1990); *Indianapolis Colts Inc. v. Metropolitan Baltimore Football*

---

**8.** The *Blockbuster* court identified six factors tending to demonstrate the existence of secondary meaning in a trademark dispute: (1) advertising expenditures; (2) consumer studies linking the name to the source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the product's use. Although the *Sassafras* and *Blockbuster* tests are comprised of essentially the same elements, this court will discuss the *Sassafras* factors as they were specifically employed in a trade dress action.

*Club,* 34 F.3d 410, 31 U.S.P.Q.2d 1811, 1815 (7th Cir.1994), such evidence would have been particularly useful in this trade dress action. Where, as here, a product's design feature is at issue, consumer survey evidence would be extremely elucidating in discerning the specific reason(s) that customers purchase the product in question.

MDI has utterly failed to produce any survey evidence from which a reasonable fact finder could conclude that MDI's dual-spring design is of primary significance in the consumer's mind as a brand identifier. *See Sassafras,* 915 F.Supp. at 7–8. Accordingly, this factor favors TrafFix.

3. Exclusivity, Length and Manner of Use

MDI asserts that it has been manufacturing and selling its wind resistant traffic stands since the mid–1970s. MDI's use of its dual-spring configuration obviously was exclusive until its patents expired in 1989. In a situation such as this, however, length of exclusive use may not truly indicate acquisition of secondary meaning. The *Thomas & Betts* court's holding in this regard is directly on point. That court stated:

> It is not enough that the consumers associate the form of the product with a particular producer. Such an association is inevitable when the first comer is the exclusive producer under a patent. Consumers must also care that the product comes from a particular producer (though they need not be able to identify him) and must desire the product with the particular feature because it signifies that producer.

*Thomas & Betts,* 65 F.3d at 658–59. Here, MDI was clearly the first comer and exclusive producer under the patent. That, however, is not sufficient to establish the dual spring design as a source signifier.

Moreover, MDI acknowledges that it licensed Eastern Metal, in approximately 1986, to use its *WINDMASTER* dual-spring configuration for sign stands. This is similar to *Sassafras* where the plaintiff, who sold pizza sets, provided its pizza set items to retailers who then marketed sets under private label trademarks. In *Sassafras,* the court found that private labeling arrangements may operate against a finding of secondary meaning because it becomes more

difficult to show that the configuration identifies a single source. 915 F.Supp. at 8 (citing *McCarthy on Trademarks,* § 8.02[5] (3d. ed.1995)). Accordingly, this factor favors TrafFix.

4. Amount and Manner of Advertising

MDI argues that the money it has spent over the last twenty years in promotional literature, consumer contacts, and trade shows is strong evidence of the secondary meaning that has developed in the minds of consumers for its sign stand. In *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863 (8th Cir.1994), the court stated that:

> Expenditures on advertising and promoting a trademark may be relevant to a determination of secondary meaning because the amount spent may be indicative of the extent to which the public associates that advertised mark with the source of the product bearing the mark.

*Id.* at 872. Although such evidence *may* be indicative of an association in the public's mind, by itself, it is not strong evidence. In *Walt–West Enter., Inc. v. Gannett Co.,* 695 F.2d 1050, 1060 (7th Cir.1982), the court explained that such advertising expenditures, as well as long and exclusive use, were not germane to the issue of secondary meaning if the plaintiff could not show that the expenditures caused the public to "regard the primary significance of the [mark] as designating a single, though perhaps anonymous, source . . ." As discussed *supra,* no survey evidence has been offered to establish such an association. Therefore, the relevance of the amount and manner of advertising in this case is minimal.

Professor McCarthy has stated that the presence or absence of "look for" promotion is relevant to the issue of secondary meaning. 1 *McCarthy on Trademarks,* § 7:30 (4th ed.1996). MDI claims that it has used such advertising in its literature. This court, however, finds no evidence of "look for" type advertising in MDI's literature which would urge the reader to identify the WINDMASTER product by the vertical dual-spring design. Instead, the brochures produced by MDI merely picture the stands and its component parts. *See Ohio Art. Co. v. Lewis Galoob Toys, Inc.,* 799 F.Supp. 870, 883 (N.D.Ill.1992) (stating that "[s]econdary

meaning cannot be established by advertising that merely pictures the product and does nothing to emphasize the mark or dress.") Moreover, while MDI's advertising consistently identifies its patents in product literature relating to the WINDMASTER sign stands, it has never identified its WIND-MASTER product configuration as protected "trade dress" in any literature that has been produced to date. Accordingly, this factor favors TrafFix.

### 5. Amount of Sales and Number of Customers

MDI claims that the amount of commercial success its sign stands have enjoyed indicates that purchasers equate the product's design with MDI. In *Aromatique,* however, the court discussed the problems associated with using evidence of sales to establish secondary meaning. The court stated:

> ... such evidence may not provide the basis for an inference of secondary meaning because something other than the secondary meaning of the trade dress may have been responsible for the success of the product. Success of a product is not among the types of evidence described by the PTO as useful in establishing secondary meaning.

*Aromatique,* 28 F.3d at 873. This is particularly so where, as in this case, the asserted trade dress is also the most functionally useful feature of the product. In this case the usefulness of the dual-spring design may very well have been the reason for MDI's sales success. Accordingly, such sales evidence is entitled to little if any weight.

In any event, the only evidence of sales success provided by MDI is its assertion that sales of the product have averaged over a million dollars a year for over twenty years. While these appear to be impressive sales figures, MDI did not provide a sufficient context for this court to assess those figures. For instance, MDI does not compare its sales figures with that of its competitors. Accordingly, this factor only slightly favors MDI.

### 6. Established Place in the Market

Neither MDI nor TrafFix has provided evidence of MDI's established market share. Due to the lack of supporting evidence, this factor favors neither party.

### 7. Proof of Intentional Copying

MDI argues that secondary meaning may be presumed from TrafFix's intentional acts of copying the design of MDI's dual spring configuration. The Seventh Circuit, however, has stated that:

> Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's. In that situation, the defendant's belief that plaintiff's trade dress has acquired secondary meaning-so that his copying will indeed facilitate his passing off-is some evidence that the trade dress actually has acquired secondary meaning.

*Thomas & Betts,* 65 F.3d at 663. In such a situation, where the product itself is copied, evidence of intent is often ambiguous. *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 611 (7th Cir.1986). "[T]he copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source." *Duraco Prods., Inc. v. Joy Plastic Enter., Ltd.,* 40 F.3d 1431, 1453 (3d Cir.1994).

At most this evidence could support an inference if supported by additional facts. *Sassafras,* 915 F.Supp. at 10. MDI, however, provides no evidence to indicate that TrafFix's act of copying was done to confuse the public. Conversely, TrafFix provides supporting deposition testimony that the act of intentional copying was not done to confuse consumers but was based upon the belief that the patents covering the design had expired and the product had moved into the public domain. Accordingly, this factor favors TrafFix.

In sum, this court's evaluation of the *Sassafras* factors reveals that no reasonable trier of fact could determine that MDI has established secondary meaning. Accordingly, this court finds that the primary significance of the appearance and configuration of MDI's dual spring design in the minds of consumers is *not* to identify it with its source.

Even if this court were to assume, *arguendo,* that MDI has established secondary meaning in its WINDMASTER product design, it would not find that TrafFix has in-

fringed MDI's alleged trade dress rights since this court finds that, as a matter of law, the MDI dual spring configuration is functional. *See* discussion *infra.*

Although this court is not prepared to find, as a matter of law, that no likelihood of confusion exists, this court will nevertheless proceed to address that issue.

**b. Likelihood of Confusion**

 In the Sixth Circuit, the legal test for determining whether a "likelihood of confusion" exists is well settled. In *Frisch's Restaurants, supra* 670 F.2d at 642, the Court of Appeals set forth eight factors that are relevant to a likelihood of confusion analysis:

1. strength of the plaintiff's [trade dress];
2. relatedness of the goods;
3. similarity of the [trade dresses];
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the [trade dress];
8. likelihood of expansion of the product lines.

*Id.* at 648 (quoting *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979)). In *Wynn Oil Co. v. Thomas,* 839 F.2d 1183 (6th Cir.1988), the Sixth Circuit explained that the *Frisch's* factors are:

> ... simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested [trade dresses]. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.

*Id.* at 1186.

While it is true that this court's likelihood of confusion analysis must consider the same *Frisch's Restaurants* factors for an alleged trade dress infringement as it did for the trademark infringement claim [9] previously decided by this court, it does not necessarily follow that this court's conclusion must be the same.

**1. Strength of MDI's Trade dress**

Although this court has previously acknowledged that MDI's trademark, WINDMASTER, is strong, the same cannot be said for the alleged trade dress of the WINDMASTER sign stand. As this court found above, MDI has *not* developed secondary meaning in its sign stand. Despite its admittedly significant expenditures on advertisements, those advertisements do not identify MDI's claimed trade dress rights in the WINDMASTER sign stand nor do they urge the consumer to identify the source of the WINDMASTER sign stand by the dual spring design. Also, as noted above, MDI's reliance on the testimony of so-called consumers to identify the WINDMASTER sign stand by the dual-spring configuration is misplaced as those persons do not constitute the relevant consumer market. Accordingly, this factor favors TrafFix.

**2. Relatedness Of The Goods**

This court has previously found, in discussing trademark infringement, that the WINDBUSTER products are virtually identical to the WINDMASTER products. Nothing in this court's analysis regarding trade dress infringement changes that finding. Accordingly, this factor favors MDI.

**3. Similarity of the Trade Dress**

While it is true that the WINDBUSTER and WINDMASTER sign stand products are virtually identical, it does not follow that there is a similarity of trade dress. This is so because there has been no showing by MDI that consumers identify the source of the dual spring design with MDI rather than TrafFix or some other source. As stated above, even if there was such an identification of product source, there would be no violation of trade dress rights as this court finds that the dual spring design is functional. See discussion *infra.* Accordingly, this factor favors neither party.

**4. Evidence of Actual Confusion**

This court previously held, in its January 13, 1997 opinion, that the testimony of MDI's salesmen regarding alleged customer confu-

---

**9.** *See Esercizio,* 944 F.2d at 1241–42 (holding that the *Frisch's Restaurant* factors should be considered in determining likelihood of confusion in a Lanham Act case).

sion is inadmissible hearsay. Mem. Op. and Order, January 13, 1997 at pg. 15. *See also Duluth News–Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir.1996). The *Duluth News* court stated that such evidence is "hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the [customer] regarding the reason for the 'confusion.'" *Id.* MDI urges this court to reconsider its prior holding regarding the admissibility of such evidence. This court, however, after reviewing the deposition testimony of Messrs. Noone, Scully, and Hyde, declines to do so and, in fact, is even more convinced that such testimony should not be admitted. Neither Messrs. Noone, Scully, nor Hyde were able to identify a specific individual customer who had exhibited confusion or on what particular occasion such confusion was alleged to have occurred.

Similarly, Mr. Lunt, whose testimony this court would consider to be evidence of actual confusion since he is a purchaser of sign stands, was instead referring to someone else's "confusion." Moreover, Mr. Lunt was not able to testify that the "confusion" he referred to dealt with the "style" of the products, stating: "I'm not sure we're talking about style of products or style of the advertisement for it."

Despite the almost complete lack of evidence as to actual confusion, this court will, once again, refrain from drawing an inference of no actual confusion. Accordingly, this court finds that this factor does not favor either party.

### 5. Marketing Channels Used

This court has previously found, in discussing trademark infringement, that the WINDBUSTER products and the WINDMASTER products are distributed through identical marketing channels. Nothing in this court's analysis regarding trade dress infringement changes that finding. Accordingly, this factor favors MDI.

### 6. Likely Degree of Purchaser Care

This court previously ruled, in its January 13, 1997 opinion, that the relevant buyer class is composed of professional purchasers which tends to lower the likelihood of confu-

sion. *See Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1111 (6th Cir.1991) (citing 2 *McCarthy on Trademarks* § 23:29 (2d ed.1984)). MDI urges this court to reconsider its prior ruling in light of the testimony of Messrs. Lunt, Hyde, Sculley, and Noone. This court, however, declines to do so, in part, because it has found that testimony inadmissible. Accordingly, this factor favors TrafFix.

### 7. TrafFix's Intent In Selecting The Dual–Spring Design

While it is indisputable that TrafFix copied the WINDMASTER dual-spring design, that fact is of limited relevance in determining TrafFix's intent since it is clear that the patents covering that sign stand were in the public domain at the time of copying and that the design was desirable. In *Esercizio*, the Sixth Circuit stated that:

'Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out.'

*Esercizio*, 944 F.2d at 1243 (quoting *West Point Mfg. Co.*, 222 F.2d at 586). The *Esercizio* court concluded that "where Ferrari's design enjoyed strong secondary meaning and Roberts admitted that he designed his cars to look like Ferrari's, the intent to copy was clear." *Id.*

In the instant case, this court has found that MDI, unlike Ferrari in *Esercizio*, did not enjoy strong secondary meaning in its product design. Moreover, while TrafFix did, in fact, copy MDI's product design, MDI does not direct this court to any evidence that the copying was done with the intent to derive a benefit from the reputation of MDI. *See Zin–Plas Corp. v. Plumbing Quality AGF Co.*, 622 F.Supp. 415, 420 (W.D.Mich. 1985). While this court did find that TrafFix infringed upon the WINDMASTER mark by adopting the WINDBUSTER mark, which was likely to confuse a purchaser as to the source of the sign stand, it does not follow that TrafFix intended to improperly trade upon the WINDMASTER design, which this court has found lacks secondary meaning, by

copying it. Accordingly, this factor favors TrafFix.

### 8. Likelihood of Expansion of the Product Lines

Both parties concede that this factor does not favor either party.

Thus, after examining the eight *Frisch* factors, this court, although firmly convinced, itself, that no likelihood of confusion exists, can not say, as a matter of law, that there is not a likelihood of confusion between the trade dress of the WINDMASTER sign stand and the WINDBUSTER sign stand.

### c. Functionality

The Supreme Court has recently stated that:

'In general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article *or* if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.

*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) (quoting *Inwood Labs.*, *supra*, 456 U.S. at 844, 102 S.Ct. at 2183–84). *See also Esercizio*, 944 F.2d at 1246 (stating that "[a] product feature is functional 'if it is essential to the use of purpose of the article or if it affects the cost or quality of the article.' ") (quoting citation omitted). Moreover, Professor McCarthy has stated that:

The existence of a valid functional patent disclosing the utilitarian advantages of the configuration in question is very strong, if not conclusive, evidence of the functionality of the configuration in which trademark significance is alleged.

1 *McCarthy on Trademarks* § 7:89 (4th ed.1996) (citing cases).

While it is axiomatic that the patent and trade dress laws protect different interests, *Thomas Betts Corp.*, 65 F.3d at 657–58, and that courts allow a party to assert trade dress rights after its patent has expired, *see, e.g., Kohler Co., v. Moen Inc.*, 12 F.3d 632, 638 (7th Cir.1993); *Application of Mogen David Wine Corp.*, 51 C.C.P.A. 1260, 328 F.2d 925, 930 (1964); *Zip Dee, Inc. v. Dometic Corporation*, 931 F.Supp. 602, 612 (N.D.Ill. 1996), it is also "well established that in the case of an expired patent, the federal patent laws do create a federal right to 'copy and use.' " *Elmer v. ICC Fabricating*, 67 F.3d 1571, 1580 (Fed.Cir.1995) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165, 109 S.Ct. 971, 985, 103 L.Ed.2d 118 (1989) (emphasis in original)). The *Elmer* court, citing *Qualitex*, also stated that "extending trademark/trade dress law to protect functional features might create perpetual, patent-like rights in unpatented or unpatentable items." *Id. See also Keene Corp. v. Paraflex Indus.*, 653 F.2d 822, 824 (3d Cir.1981).

It is important to bear in mind that the burden remains upon MDI to establish the non-functionality of the WINDMASTER sign stand rather than on TrafFix to show that it is functional. *Esercizio*, 944 F.2d at 1239. Therefore, MDI, as part of its burden of proving non-functionality by a preponderance of the evidence, must overcome the effective presumption that the disclosures of the '696 and '482 patents establish that the dual spring configuration of the WINDMASTER sign stand is functional.[10]

Essentially, MDI makes three arguments in support of its claim that the configuration it alleges as protected trade dress is nonfunctional. First, MDI argues that its '696 and '482 utility patents are irrelevant to the issue of functionality. Second, MDI argues that use by others of the configuration it

---

**10.** MDI concedes that while functionality is a question of fact, where the facts pertaining to functionality are not in dispute, as in this case, the court may rule on the question. *See, e.g., HWE, Inc. v. JB Research, Inc.*, 993 F.2d 694, 696 (9th Cir.1993) (affirming the district court's decision in favor of defendant on summary judgment that plaintiff did not meet its burden on issue of functionality); *Interactive Network, Inc.* *v. NTN Communications, Inc.*, 875 F.Supp. 1398, 1409 (N.D.Cal.1995) (granting summary judgment because party with burden of proving nonfunctionality could not do so); *San Francisco Mercantile Co., Inc. v. Beeba's Creations, Inc.*, 704 F.Supp. 1005, 1009 (C.D.Cal.1988) (granting summary judgment because disputed designs were functional).

claims as trade dress is not a competitive necessity. Third, MDI claims that its advertising has continuously promoted the "look" of its sign stand rather than its utilitarian or functional advantages.

 At the outset, this court notes that when determining whether a product configuration is functional, the product configuration must be looked at in its entirety, not as discrete features that may be functional individually. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 678 F.Supp. 1336, 1351 (N.D.Ill.1988). *See also, Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir.1988). An overall design combination of features that are individually functional is protectable if the combination of those elements is not functional. *See* Restatement (Third) of Unfair Competition § 17, comment b (1995). MDI claims that its trade dress comprises five elements *see supra*, p. 265, and that these must be considered in their entirety, not as individual components. However, the only significant distinction in appearance between MDI's sign stands and the sign stands of MDI's competitors is the vertical dual-spring design or configuration. Each of the competitors' sign stands identified by MDI includes the other four features claimed as elements of the alleged trade dress. Thus, while this court must look to the entire claimed trade dress, it is clear that the only element of MDI's alleged trade dress that arguably sets MDI's product apart from its competitors, and thus could operate as a source identifier, is the pair of vertically arranged closely spaced coil springs.

The first issue to be addressed in determining whether MDI's asserted trade dress is nonfunctional is the significance of MDI's expired '696 and '482 patents. In *In re Morton–Norwich Products. Inc.*, 671 F.2d 1332 (C.C.P.A.1982), the court cited its prior decision in *In Re Shenango Ceramics, Inc.*, 53 C.C.P.A. 1268, 362 F.2d 287, 291 (1966), stating that "the existence of an expired utility patent which disclosed the *utilitarian advantage of the design* sought to be registered as a trademark was *evidence* that it was 'functional'." (citation omitted in original) (emphasis in original). Moreover, Professor McCarthy has stated that:

Although the courts treat functional patents as evidence of primary functionality, this evidence is particularly entitled to great weight if the patent was applied for by the same person who now asserts trademark significance in the same configuration. A kind of estoppel arises. That is, one cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection. Functional patent protection and trademark protection are mutually exclusive.

1 *McCarthy on Trademarks* § 7:89 (4th ed.1996).

MDI argues that its '696 and '482 patents are not relevant to the issue of functionality because they do not disclose the closely-spaced vertical dual spring configuration of the WINDMASTER traffic sign stands and therefore they do not teach the specific configuration of the claimed WINDMASTER trade dress. This court, however, finds such a position to be untenable given MDI's past enforcement of these utility patents. While the configuration being claimed as trade dress in this case is not literally disclosed in the '696 or '482 patents, MDI has, in the past, enforced its rights in its '696 and '482 patents by enjoining the manufacture of a product configuration virtually identical to that being alleged to constitute trade dress in the instant case. *See Winn–Proof Corp., supra*, 203 U.S.P.Q. at 60.[11] In *Winn–Proof,* the court found that the Winn–Proof sign stand, which included two closely-spaced vertical coil springs, infringed MDI's '696 and '482 patents under the doctrine of equivalents and enjoined manufacture of that sign stand. *Id.* at 68. In arguing for this judg-

---

11. MDI urges this court to distinguish *Winn–Proof* because Sarkisian, who is the patent owner, was the plaintiff rather than MDI. However, Sarkisian, who is the president and principal of MDI, had all of "his" litigation expenses paid for by MDI. Accordingly, this court will consider Mr. Sarkisian and MDI, for purposes of the instant motions, to be interchangeable.

ment, counsel for MDI,[12] in his post-trial brief, asserted not only that the configuration of defendant's sign stand was substantially similar to the configuration now being asserted as trade dress by MDI, but also that the imitated features are functional.

Specifically he stated:

... Sarkisian's teaching of the "WindMaster" concept *was incorporated by plaintiff into a roadside construction sign stand having a single upright and ... coil springs mounted close together in an arrangement markedly similar to defendants' models ....* [T]he unique manner in which "WindMaster" sign stands with large display areas [ ] *function,* though unanchored and readily portable, to be stable against tipping under high wind conditions [is] *a function fully incorporated in the accused devices of [the] defendants ...* (emphasis added).

Furthermore, counsel asserted that all MDI's various sign designs, which would include the design now being asserted as trade dress, are functionally equivalent:

As shown at trial, all of the various "WindMaster" sign stands incorporate all of the features, perform in the same manner, and achieve the same results as the sign stands disclosed and claimed in the '696 and '482 patents.

These arguments that the closely-spaced dual-coil spring design performs or functions in an equivalent manner to the more spaced-apart dual-coil springs are especially significant given the arguments that MDI made in its efforts to obtain its patents. MDI argued that the functioning of the dual-spring design was superior to the single-spring design taught by the prior art:

One of the novel points of structure in the present invention is the provision of a pair of spring connections as opposed to a single spring connection as has been used in the past in connection with signs .... The reason for providing two spaced apart spring connections is to force the sign to deflect in a direction along the longitudinal axis of the base and to prevent twisting of the sign frame.

MDI has not explained how its two positions, one touting the functionality of the dual-spring design, whether closely or widely spaced, for purposes of obtaining and enforcing its patents, and the other, disclaiming the functionality of its closely spaced dual-spring design for purposes of obtaining trade dress protection, are not inconsistent. Instead, MDI argues that the "fact that MDI previously asserted its patent rights against a sign stand with coil springs is riot relevant ... [because] that prior case was patent infringement which focused on the utility of the products as described by the patent claims—not their physical appearance." This response, however, misses the point. As the Supreme Court stated in *Qualitex:*

The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by *allowing a producer to control a useful product feature.*

*Qualitex,* 514 U.S. at 164, 115 S.Ct. at 1304 (emphasis added).[13]

---

**12.** Present counsel for MDI, Mr. John A. Artz, also represented Mr. Sarkisian in the *Winn–Proof* case.

**13.** Without much in the way of elaboration, plaintiff directs this court's attention to a number of products that have been granted trade dress rights despite having some utilitarian features. This court, however, finds that each is distinguishable from the case at bar. In *In re Weber–Stephen Products Co.,* 3 USPQ2d 1659, 1987 WL 124298 (T.T.A.B.1987), the Court affirmed the registration for the configuration of the round Weber grill as non-functional. While the Weber grill was patented, the Court found that "nothing in the patent discloses any utilitarian advantages of this particular design." Further, the Court identified many equivalent and available designs. In *Black & Decker Corp. v. Int'l Sales and Marketing,* 36 USPQ2d 1851, 1995 WL 776943 (C.D.Cal.1995), the Court's 52 word analysis of functionality is of little assistance to this court, especially given that the court made no mention of any patent, expired or otherwise. In *In re Honeywell, Inc.,* 8 USPQ2d 1600, 1988 WL 252417 (1988), the Court found that the patents which had covered this device "relate[d] to the inner workings of the thermostat ... [and that] there is nothing of inherent utilitarian value about the circular round shape of the cover [ ]." Furthermore, the Court found that in the 17 years since the patent had expired, no one else had made use of a rounded circular cover configuration and therefore concluded that a cover so

MDI next argues that use by others of the configuration it claims as trade dress is not a competitive necessity. MDI states that the test of competitive necessity is "whether the market would be foreclosed if a competitor could not market an identically configured product." This, however, is something of an overstatement. According to the Restatement (Third) of Unfair Competition § 17, comment b (1995), "[A] design may be functional if it is *one of a limited number* of superior designs." (emphasis added). Furthermore, the Federal Circuit has stated:

> That another type of [design] would work equally as well does not negate that this [design] was designed *functionally* to enhance or at least not detract from the rest of the system.... If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered.

*In re Bose Corp.*, 772 F.2d 866, 872 (Fed.Cir. 1985) (emphasis in original). Moreover, the Supreme Court in *Qualitex* noted that the exclusive use of the claimed configuration may put competitors at a disadvantage if use of that configuration "affects the cost or quality of the article." *Qualitex, supra*, 514 U.S. at 165, 115 S.Ct. at 1304.

As stated earlier, it is MDI's burden to prove nonfunctionality; thus, MDI must show not only that alternative designs exist, but also that those alternatives effectively eliminate competitors' need for the features that MDI is asserting as protectable trade dress. *See Elmer*, 67 F.3d at 1580.

MDI argues that its asserted trade dress is nonfunctional because the number of alternative sign stand designs available to TrafFix is "virtually unlimited." MDI refers specifically to designs made by six competitors in the traffic control work zone market: Sign–Up Corp., Dicke Tool, Eastern Metal, Work Area Protection, Korman Signs, and Services and Materials. As TrafFix points out, however, these purported alternatives are either unequal to MDI's dual spring design or unavailable. None of the so-called alternative designs are capable of withstanding the 75 mph winds tolerated by MDI's sign stand.[14] Moreover, four of the sign stands touted as alternatives which advertise a wind resistant feature are patented and are therefore unavailable for use by others.[15]

As disclosed in its '696 and '482 patents, MDI attributes its sign stands' ability to withstand high winds to their dual-spring construction. Furthermore, Mr. Hillstrom stated that in changing the MDI sign stand from their widely-spaced dual-spring design to the closely-spaced dual-spring design, MDI reduced the size of the base, making the sign stand more compact and lighter weight. Also according to Mr. Hillstrom, by changing to the closely-spaced dual-spring design, MDI lowered the cost to manufacture the sign stand. Such evidence that a design feature affects the cost or quality of an article was noted by the Supreme Court to be particularly indicative of functionality. *See Qualitex*, 514 U.S. at 164–66, 115 S.Ct. at 1304.

MDI has not shown that competitors in the traffic work zone sign stand market have no need for lightweight, easily portable, wind resistant sign stands. Indeed, Mr. Hillstrom stated that the changes in the design of the WINDMASTER sign stands were made in response to just such a perceived need. Moreover, MDI has not proffered sufficient

shaped was not a competitive necessity. In *Sunbeam Products Inc. v. The West Bend Co.*, 39 USPQ2d 1545, 1996 WL 511639, the Court found that while the mixer was comprised of many functional components, many of which had been patented, the overall shape and configuration was non-functional. Conversely, in the case at bar, the only feature identified that could arguably be the product's "trade dress" is the most functional feature of the product. Finally, plaintiff directs this Court to the Coca–Cola bottle example. All that plaintiff offers as evidence of the non-functionality of the Coke bottle is a trademark registration number. No evidence of

any patent, expired or otherwise, is offered, nor any analysis of its non-functionality.

14. Further, TrafFix offers MDOT specifications as evidence that many of the proposed alternatives do not match WINDMASTER'S performance.

15. MDI also suggests, by way of a declaration from their designer, Mr. Hillstrom, that hypothetical alternative designs can be used. However, these designs are unsupported by any evidence that they are equal in performance.

evidence that competitors have viable alternatives to meet such a need. If the purported alternatives are not available and equal, then they are not true alternatives.

MDI'S third argument is that its advertising has continuously promoted the "look" of its sign stand rather than its utilitarian or functional advantages. If a seller encourages customers "to 'look for' a particular product or package feature," this is "evidence of trademark or trade dress status in that feature,[ ] as well as evidence of the presence of secondary meaning." 1 *McCarthy on Trademarks* § 7:74 (4th ed.1996) (citing cases). On the other hand, "[i]f a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality." *Id.*

While MDI has highlighted the dual-spring construction and its ability to withstand high winds in its promotional literature, it has not, as discussed *supra,* utilized "look for" advertising. Since the dual-spring construction is arguably the most *utilitarian* aspect of MDI's sign-stands, the advertising that emphasizes that configuration in the absence of any "look for" designation is significant in finding the dual-spring design functional.

This court finds that MDI has not proffered sufficient evidence which would enable a reasonable trier of fact to find that MDI's vertical dual-spring design is *non-*functional. The expired utility patents are especially strong evidence of the usefulness of the dual-spring design. The alternative designs suggested by MDI are few and unequal to the WINDMASTER sign stand in performance. Finally, MDI's advertising emphasizes the functional advantages of the dual spring design rather than its look. Thus, this court finds that the dual-spring design asserted by MDI as trade dress is functional as a matter of law and not entitled to trade dress protection under the Lanham Act.

## Conclusion

For the reasons stated above, this court finds that no reasonable trier of fact could conclude that MDI has established secondary meaning in its WINDMASTER sign stand design. Even assuming, *arguendo,* that MDI has created a genuine issue of fact as to secondary meaning, this court finds that, as a matter of law, the pair of vertically arranged closely spaced coil springs attached to the base member on the MDI WINDMASTER sign stand is functional. Accordingly, MDI's motion for summary judgment is denied and TrafFix's motion for summary judgment is granted.

MDI's WINDMASTER sign stand TrafFix's WINDBUSTER sign stand

Figure 1.

### ORDER

**IT IS HEREBY ORDERED** that plaintiff, MARKETING DISPLAYS, INC.'s, motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), on Counts II and IV of its amended complaint, is **DENIED.**

**IT IS FURTHER ORDERED** that defendant, TRAFFIX DEVICES INC.'s, motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), on Counts II and IV of plaintiff's amended complaint, is **GRANTED** and that plaintiff, MARKETING DISPLAYS, INC., take nothing.

**SO ORDERED.**

### ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION

On June 10, 1997, this court entered an order granting the defendant, TrafFix's, motion for summary judgment and denying the plaintiff, MDI's, motion for summary judgment as to Counts II and IV of MDI's amended complaint. On June 24, 1997, MDI timely filed a motion for reconsideration pursuant to Local Rule 7.1(h) (E.D.Mich. Nov. 7,

1994). MDI asserts that this court erred in 1) limiting its analysis of MDI's trade dress to a pair of vertically arranged closely spaced coil springs, 2) ruling that MDI's trade dress was not inherently distinctive, 3) ruling that MDI's trade dress did not have secondary meaning, 4) not ruling that there was a likelihood of confusion between MDI's alleged trade dress and TrafFix' sign stand, and 5) ruling that MDI's alleged trade dress is functional as a matter of law.

While plaintiff asserts that this court committed "error" for the reasons stated above, plaintiff never couches its arguments in the appropriate legal standard of review of a motion for reconsideration. The Local Rules for the Eastern District of Michigan state that in a motion for reconsideration "the movant shall not only demonstrate a palpable defect by which the court and the parties have been misled but also show that a different disposition of the case must result from correction thereof." L.R. 7.1(h)(3). A "palpable defect" is a defect which is obvious, clear, unmistakable, manifest or plain. Webster's New World Dictionary 974 (3rd Ed.1988). The Local Rules also provide that any motion for reconsideration which merely presents the same issues relied upon by the court, either expressly or by reasonable implication, shall be denied. L.R. 7.1(h)(3).

MDI has not demonstrated that a palpable defect occurred in this court's June 10, 1997 order. In large part, MDI's arguments in support of reconsideration merely reiterate the arguments it previously presented to this court. This court has already considered these arguments and has resolved them

against MDI. This court, however, will take this opportunity to further elucidate the conclusions of the June 10, 1997 opinion.

First, plaintiff argues that this court erred in narrowing its consideration of MDI's alleged trade dress to a pair of vertically arranged closely spaced coil springs when plaintiff defined its trade dress as comprising a narrow base, closely spaced coil springs, four leg members extending at angles from the base, an upright, and a sign.[1] MDI contends that it is entitled to consideration of its entire trade dress because the image and "look" which separates it from its competitors is the entire "synergistic"[2] combination of elements claimed.

Every single one of the competitors cited by MDI, however, markets a sign stand with a narrow base, four leg members extending at angles from the base, an upright, and a sign. As such, MDI's argument that a pair of vertically-arranged coil springs combined with other leg members variously shaped, i.e., U-shaped, parallel, etc., and/or other uprights, i.e., twin poles, A-shaped, etc., may create an entirely different look altogether, is irrelevant to this court's finding. Moreover, as this court pointed out in its June 10, 1997 opinion, MDI's own references to its product effectively concede the fact that the dual spring configuration is the only element that sets MDI's alleged trade dress apart from that of its competitors. *See* Opinion and Order, p. 5, fn. 6. Also telling is that in support of MDI's assertion that all its competitors "have different product configurations and designs," MDI describes each of them only in terms of its spring mechanism.

1. Plaintiff asserts that TrafFix never contested MDI's definition of MDI's alleged trade dress. This assertion, however, is incorrect. *See* TrafFix's Brief in Reply to MDI's Opposition to TrafFix's Motion for Summary Judgment, p. 4.

2. The court finds plaintiff's use of the word "synergistic," in describing the combination of elements it alleges as its trade dress, curious to say the least. As plaintiff's counsel is aware, "synergism" is a concept in patent law sometimes discussed in relation to the nonobviousness of an invention. This court is not aware of any use or application of the term in the law of trade dress. In fact, the Ninth Circuit in *Sarkisian v. Winn-Proof Corp.*, 688 F.2d 647 (9th Cir.1982), a case intimately involved in this matter, stated that:

A definition of synergism that reflects its etymon is that the elements in the combination must cooperate or interact with each other. So defined, synergism distinguishes those inventions in which parts are merely aggregated, and those in which the parts coact with each other so that the result comes from the combined effect of the several parts and not simply from the separate action of each.

*Id.* at 649, fn. 1. That plaintiff would use a term that speaks to the interactive functioning of the elements of MDI's sign stand in its efforts to describe its appearance seems to support rather than contradict this court's finding that MDI's alleged trade dress is functional.

*See* MDI's Brief in Opposition to TrafFix's Motion for Summary Judgment, p. 11. Accordingly, this court finds no palpable defect has occurred in this regard.

Plaintiff next argues that the court erred in finding that its trade dress is not inherently distinctive. Under the applicable legal standards cited by this court, trade dress can be identified in one of two ways, either as being inherently distinctive or as having acquired secondary meaning. Plaintiff claims that it did not choose to argue inherent distinctiveness for purposes of this motion, but instead chose to rely on its argument that its sign stands had acquired secondary meaning. Yet, at oral argument, when queried by this court as to what evidence supported its claim of inherent distinctiveness, counsel for plaintiff merely offered the wholly unpersuasive fact that Messrs. McKenney, Kuczera and Ursprung could identify a WINDMASTER stand on the side of the road. Since plaintiff has the burden of proving *either* secondary meaning or inherent distinctiveness and chose to present *only* evidence of secondary meaning, with no alternative argument in favor of inherent distinctiveness, this court finds no palpable defect occurred in finding that MDI conceded inherent distinctiveness for purposes of this motion.

Third, plaintiff alleges that this court erred when it found that MDI's alleged trade dress had not acquired secondary meaning. In regard to the factor of direct consumer testimony, plaintiff contends that the court incorrectly found that consumers of WINDMASTER sign stands are professional purchasers, and that that finding led the court to the incorrect conclusion that consumers did not or could not identify MDI's sign stands by its trade dress.

While this court did find that consumers of sign stands are professional purchasers, the court did not find that consumers of sign stands could not identify MDI's stands. The court merely found that because deponents McKenney, Kuczera, and Ursprung were not consumers of sign stands, their deposition testimony was not relevant to the question of whether consumers of sign stands could identify MDI's sign stands by its alleged trade dress. Since MDI offered no other evidence of "direct consumer testimony" in support of its claim of secondary meaning, the court found for TrafFix on that factor.

MDI also asserts that it "did not believe that TrafFix seriously contested the issue of secondary meaning in view of such statements from its own witnesses and independent parties" and thus did not think further consumer evidence was necessary.[3] Subsequent to oral arguments, however, MDI elected to submit without leave of, or notice to, this court forty declarations from parties it describes as professional purchasers of sign stands which it claims "provide direct testimony as to the significance of MDI's trade dress." Plaintiff asks this court to reconsider its findings in light of this additional evidence. This court declines to do so for the following reasons.

First, the declarations were solicited by plaintiff, which provided a form on which its customers simply filled in a few blanks. Consumer testimony in this format is not persuasive. In discounting the weight of very similar evidence, the court in *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863 (8th Cir.1994), stated that:

> the letters were merely copies, in some cases simply photocopies with the blank spaces filled in, of a form letter provided by Aromatique. As in the *Application of*

---

**3.** MDI characterizes the testimony of witnesses McKenney and Kuczera on the issue of consumer recognition of trade dress as "uncontested." This characterization, however, is not entirely accurate. *See* TrafFix's Brief in Opposition to MDI's motion for Summary Judgment, p. 13, where TrafFix contests MDI's attempts to utilize the testimony of Kuczera and McKenney to establish the distinctiveness of the MDI design.

Moreover, in light of the arguments presented by TrafFix in their response brief, MDI's assertion that it "did not believe that TrafFix seriously

contested the issue of secondary meaning in view of such statements from its own witnesses" is incredible to say the least.

MDI also contends that it believed that it did not need to present further evidence of direct consumer testimony in light of the declaration testimony of the three MDI salesmen, Noone, Hyde and Scully. Such reliance, however, was clearly misplaced given that this court has on several previous occasions found that testimony to be inadmissible hearsay.

*Mogen David,* '[i]n substance, they amounted to hardly more than a carte blanche approval of that which had been formulated by a party naturally and understandably desirous of serving its own interest.' (citation omitted).

*Id.* at 872. Moreover, like the letters submitted in *Aromatigue,* the declarations submitted by MDI are unsworn. This court finds that these declarations should be accorded little, if any, weight as evidence of secondary meaning and accordingly finds that no palpable defect occurred in this regard.

Plaintiff next asks this court to reconsider its findings regarding its exclusivity, length and manner of use; amount and manner of advertising; and amount of sales and number of customers as they relate to secondary meaning. The court has adequately addressed these issues in its opinion and finds that no palpable defect has occurred in this regard. The court declines to reiterate its reasoning here, except to address two points made by plaintiff.

First, in arguing that MDI's patents are irrelevant to the issue of exclusivity of use, plaintiff contends that "anyone could have made a sign stand prior to 1989 which had virtually all of the unique aesthetic features of the WINDMASTER sign stands and yet not infringe any of MDI's patents." This court is hard pressed to imagine such a sign stand. For example, plaintiff points out that in order to infringe the '482 patent, it is necessary to have the center of gravity of the sign fall within the ends of the legs. It does not appear possible to this court for a sign stand to look like MDI's WINDMASTER product, be able to stand upright, and function as a sign stand, but have a center of gravity that falls outside the ends of the stand's legs. Notably, MDI has not offered a description of such a stand.

Second, plaintiff asserts that this court did not take into account the fact that MDI's patents expired in 1989 and that TrafFix's alleged infringement did not begin until 1994–95, about five years later. Plaintiff

points out that under the Lanham Act, proof of substantially exclusive and continuous use of a mark for five years preceding application for registration *may* be accepted as *prima facie* evidence of secondary meaning. *See* 15 U.S.C. § 1052(f). This court notes that the plain language of the statute is clearly discretionary and also notes that MDI merely makes the conclusory statement that it enjoyed exclusive use for five years, but did not proffer evidence of exclusive use for that period. Moreover, in view of the fact that MDI licensed Eastern Metal to use its WINDMASTER dual spring configuration for at least a portion of that five-year period, it appears that MDI could not show exclusive use.[4]

■ Finally, on the issue of secondary meaning, plaintiff contends that this court failed to draw the appropriate inferences from the actions by TrafFix in copying MDI's alleged trade dress. The case law cited by this court in its opinion, however, provides ample basis for defendant's belief that once the patents on plaintiff's sign stands had expired, it, as well as anyone else, was entitled to copy the product. Nothing presented by plaintiff in its motion for reconsideration suggests that a palpable defect occurred in this regard.

Plaintiff's fourth argument is that this court committed error in not ruling that there is a likelihood of confusion between MDI's WINDMASTER products and TrafFix's sign stand because it improperly decided the secondary meaning issue. Because MDI offers no additional arguments besides those proffered in their secondary meaning argument, this court will not endeavor to readdress those arguments here.

Finally, plaintiff argues that this court committed error in finding MDI's WINDMASTER product functional as a matter of law. MDI focuses on the court's finding that exclusive use of the dualspring configuration by MDI would put competitors at a disadvantage because it is one of a limited number of superior designs. In support of its argument

---

4. MDI contends that the license to Eastern Metal supports MDI's claim to trade dress rights because it is evidence that Eastern Metal acknowledged the value, meaning and significance of MDI's trade dress. This court, however, does not consider a license agreement with a third party, entered into in settlement of litigation, to be persuasive evidence of secondary meaning.

to the contrary, MDI cites deposition testimony, declarations, and advertising brochures, all of which accompanied its earlier briefs and was considered by the court. Further, MDI proffers additional evidence that not all DOTs require stands that can withstand 70–75 mph winds and that the results of tests conducted by David Hillstrom, a senior design engineer at MDI, show that the MDI sign stand and three competitors' stands "performed virtually identically in wind forces up to and including 75 mph."

In *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557 (7th Cir.1985), the Court discussed the issue of new evidence advanced in a motion for reconsideration. There, the court stated that:

> Motions for reconsideration serve a limited function; to correct manifest errors of law or fact or to present newly discovered evidence. *Such motions cannot* in any *case be employed as a vehicle to introduce* new evidence that could have been adduced *during the pendency of the summary judgment motion.* (emphasis in original).

*Id.* at 561. The court notes that all of the "new evidence" submitted by MDI could have been adduced during the pendency of its summary judgment motion and, at the very least, advanced at oral arguments. MDI was well aware that "competitive necessity" is an element of a functionality determination and should have proffered all relevant evidence concerning that issue in its briefs or at oral arguments. Because the evidence now proffered by MDI is not "newly discovered," but could have been acquired during the pendency of its original motion, the court declines to re-analyze its finding concerning functionality in light of that evidence.

 Even if this court were to allow the "new evidence" as proof that all three competitors' stands are comparable in terms of wind resistance, the fact that the number of superior designs available to competitors remains limited still supports a finding of functionality.[5] *See In re Bose Corp.*, 772 F.2d 866, 872 (Fed.Cir.1985). Moreover, even if plaintiff's arguments regarding "competitive necessity" are accepted, this court reminds plaintiff that "competitive necessity" is but one element to consider in a determination of functionality.[6] As previously noted, the Federal Circuit has stated:

> That another type of [design] would work equally well does not negate that this [design] was designed *functionally* to enhance or at least not detract from the rest of the system. . . .

*In re Bose Corp.*, 772 F.2d at 872 (emphasis in original). Accordingly, this court finds no palpable defect in regard to its finding on competitive necessity.

Similarly, the court finds plaintiff's arguments concerning the significance of the '696 and '482 patents unpersuasive. Plaintiff argues that the court's reasoning relative to these patents and a finding of functionality is in direct conflict with the general legal standards that trade dress rights can properly be asserted after a patent has expired. The court acknowledges that such rights, in certain circumstances, can be asserted. Such circumstances, however, do not exist in this case. A cursory review of this court's opinion reveals that it is well supported by au-

---

5. Plaintiff also submits a declaration by Clifford Sadler stating that the court erred in concluding that existing patents on a number of sign stands claimed by MDI to be viable alternatives renders them unavailable. The court does not find that plaintiff has established that a palpable error occurred where plaintiff merely offers conclusions of law presented in a declaration unsupported by legal authority. As such, this court's conclusion, that the existence of utility patents on certain competing designs limits the number of superior designs available to competitors, is unaffected.

6. Plaintiff also contends that this court erred in finding that even though some competitors' sign stands are less expensive than the WINDMASTER stand, the change in design of the WINDMASTER stand from the widely-spaced dual-spring design to the closely spaced dual-spring design is evidence of the functionality of the dual-spring design. Plaintiff apparently misconstrues the court's finding. The court simply credited Mr. Hillstrom's testimony concerning the design change as evidence that MDI's dual-spring design *affects the cost or quality of the article*, not that it had any significance in relation to the cost of competitors' stands. As previously noted, the Supreme Court in *Qualitex* found such evidence to be indicative of functionality.

282

thority stating that an expired utility patent can be evidence of functionality in the trade dress context. MDI, on the other hand, cites no legal authority for its argument that utility patents play no role in the determination of functionality of alleged trade dress. Accordingly, this court finds that no palpable defect occurred in this regard.

In sum, this court finds that plaintiff has not demonstrated a palpable defect which would result in a different disposition of plaintiff's motion for summary judgment. Accordingly, plaintiff's motion for reconsideration is denied.

**SO ORDERED.**